UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

HOWARD YOST, individually and as next of )
Friend K.Y., and KEATON YOST, )
 )
          Plaintiffs, )
 )
v. )                    No. 2:18-CV-138-DCP
 )
WAYNE WILHOIT,  et al., )
 )
          Defendants. )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 20].

Now before the Court is Defendants' Motion for Summary Judgment [Doc. 81].  Plaintiffs

have responded to the Motion [Doc. 106], and Defendants have replied [Doc. 111].  The Motion

is ripe for adjudication.  Accordingly, for the reasons explained below, the Court **GRANTS IN**

**PART AND DENIES IN PART** Defendants' Motion [**Doc. 81**].

## I.       BACKGROUND

This lawsuit was filed on August 20, 2018, by Howard Alan Yost, individually, and as next of

friend of Kameron Yost and Keaton Yost. [Doc. 1].[1]  The Complaint alleges violations of 42 U.S.C. §

1983 and various state laws against Defendants Wayne Wilhoit ("Wilhoit"); Pat Hankins ("Hankins"),

in his official capacity as Sheriff of Greene County, Tennessee; David McLain ("McLain"), in his

official capacity as Director of Schools for Greene County, Tennessee; Greene County Commission

---

[1] In Plaintiffs' Response [Doc. 106], they note that Kameron Yost, who is identified as
"K.Y." in the caption of the Complaint, has now attained the age of majority.

("Commission"); Greene County Board of Education ("Board"); and Greene County, Tennessee ("County"). [Doc. 1 at 1]. On January 25, 2019, the parties stipulated to the dismissal of the individual capacity claims against Pat Hankins and David McLain. [Doc. 32]. The remaining Defendants, Wilhoit, the Commission, the Board, and the County, have now moved for summary judgment.

The following facts are undisputed, unless otherwise noted. On August 24, 2017, Howard Yost drove Keaton Yost and Kameron Yost to Chuckey-Doak High School ("Chuckey-Doak") in a white Hummer-H3 ("Hummer"). [Doc. 111 at ¶¶ 1-2]. Howard Yost was the driver of the vehicle, Keaton Yost sat in the front passenger seat, and Kameron Yost sat in the back seat behind his father. [*Id.* at ¶ 12]. Upon arriving at Chuckey-Doak, Keaton Yost indicated that he wanted to have his own vehicle at school that day. [*Id.* at ¶ 3]. Keaton Yost testified that he no longer wanted to be dropped off, and Howard Yost said that he needed to go to the bathroom. [Doc. 81-8 at 12]. Thus, the three began driving back home, which was approximately 1.6 miles away from Chuckey-Doak. [Doc. 106 at 17].

On the same day, August 24, 2017, Defendant Wilhoit was working as a school resource officer at Chuckey-Doak and was employed the County through its Sheriff's Department. [Doc. 83 at ¶ 3].[2] Defendant Wilhoit was sitting in his marked patrol car observing traffic entering and exiting the school parking lot when he observed a white Hummer enter the Chuckey-Doak parking lot and then leave. [*Id.* at ¶¶ 11, 13]. The next set of facts are somewhat disputed. Specifically, according to Defendant Wilhoit, the following occurred:

> I observed a white Hummer H-3 enter the Chuckey-Doak parking lot and leave. I observed the Hummer exiting the parking lot while traveling at a high rate of speed and greater than the posted 15 mile an hour speed limit. In addition to the speeding, the Hummer was being driven in a reckless and erratic manner. I was unable at that

---

[2] In Plaintiffs' Response [Doc. 107] to Defendants' Statement of Undisputed Facts [Doc. 83], Plaintiffs admit the following paragraphs for purposes of summary judgment: 1-7, 10-13, 16-17, 25-37, 39-63, and 65-70.

time to specifically identify the driver. I was able to specifically identify the vehicle itself. As the Hummer was leaving the area where I had been stationed in the school parking lot, I observed it run a stop sign. After I observed it run a stop sign, I briefly lost sight of the vehicle after it turned from Chuckey-Doak Road onto Highway 11E. I then lost sight of it again after it turned onto Meadowbrook Road, which to the best of my knowledge was the only entrance and exit to the Meadowbrook subdivision. As I was attempting to pursue and stop the vehicle, I had both my lights and sirens activated, but the vehicle was successful in its attempts to evade me. I turned into the Meadowbrook subdivision and despite my efforts to locate the vehicle I was not successful. I decided to turn around and go back to the high school. As I was sitting at the stop sign waiting for traffic on Highway 11E to pass so I could pull out onto the highway, I saw the vehicle I had observed and identified minutes earlier pull up behind me.

[Doc. 81-5 at ¶ 3].

Howard Yost testified that on the way back home, he approached a stop sign, and he admitted that he rolled through the stop sign. [Doc. 81-7 at 9-10]. Howard Yost stated that the speed limit was fifteen (15) miles in the zone where he was driving, and he agreed that he was going "a tad" over the speed limit. [*Id.* at 12]. Thus, the parties do not dispute that Howard Yost drove over the speed limit and that he did not stop at a stop sign.[3] In addition, the parties do not dispute Defendant Wilhoit was unable to identify the driver when he saw the Hummer in the school parking lot. [Doc. 83 at ¶ 17]. The parties do dispute whether Defendant Wilhoit activated his blue lights and siren.

According to Kameron Yost, "At no time did my father appear to be speeding. Furthermore, there was never any law enforcement behind my father's vehicle while we [were] driving home that morning." [Doc. 106 at 4].[4] In addition, Kameron Yost states, "[A]t no time

---

[3] The parties dispute the speed at which Howard Yost was traveling.

[4] As stated above, Howard Yost acknowledged that he was speeding.

did I hear any sirens as we were driving home, or see any blue law enforcement lights as we were driving home." [*Id.*]. According to Howard Yost, "At no point during the drive home did I notice a law enforcement vehicle behind me. Further, at no point during the drive home did I see law enforcement blue lights or hear a siren." [*Id.* at 7].

When Plaintiffs arrived home, Howard Yost went inside, Keaton Yost got into the driver seat of the Hummer, and Kameron Yost got into the passenger seat, and they (Keaton Yost and Kameron Yost) began making their way back to school. [Doc. 81-9 at 8]. According to Defendant Wilhoit, as he was sitting at a stop sign at the exit to the Meadowbrook subdivision waiting for traffic on Highway 11E, the vehicle that he had previously observed pulled behind him. [Doc. 83 at ¶ 24].[5] Defendant Wilhoit executed a traffic stop on that vehicle by turning his vehicle around to face it perpendicularly. [*Id.* at ¶ 25]. Kameron Yost observed Defendant Wilhoit's vehicle engage its blue lights, turn around to face them, and as Defendant Wilhoit approached the driver's side door, Kameron Yost called Howard Yost. [*Id.* at ¶ 47].

At that point, Defendant Wilhoit approached the driver, Keaton Yost, in an effort to secure and investigate. [*Id.* at ¶ 26]. Defendant Wilhoit first ordered Keaton Yost to throw his keys out of the window, and Keaton Yost complied. [*Id.* at ¶ 27]. Defendant Wilhoit then opened the door and handcuffed Keaton Yost. [*Id.* at ¶¶ 28-29]. Keaton Yost gave Defendant Wilhoit his hands and wrists without incident. [*Id.* at ¶ 42]. Defendant Wilhoit walked Keaton Yost back to the area next to the rear wheel on the driver's side and sat him on the ground. [*Id.* at ¶ 29]. Defendant

---

[5] In response to Defendants' Statement of Undisputed Facts, Plaintiffs deny this fact, although it is unclear to the Court as to why they have denied it. *See* [Doc. 107 at 2] (stating that Plaintiffs deny the material facts set forth in paragraphs 18 through 24). In Plaintiffs' Statement of Additional, Undisputed Facts, they submit as follows: "Keaton and Kameron were in the car, travelling back to school, had been travelling for 2 minutes, and had not reached the school when they were pulled over by Wayne Wilhoit, who was sitting at the stop sign located at junction of Meadowbrook Road and the East Andrew Johnson Highway." [Doc. 108 at ¶ 10].

4

Wilhoit did not strike, hit, or otherwise have any other contact with Keaton Yost either before or after he was handcuffed other than with a hand on an arm as they walked. [*Id.* at ¶ 45].

Defendant Wilhoit proceeded around the back side of the vehicle and to the front of the passenger's side. [*Id.* at ¶ 30]. Defendant Wilhoit did not have to give Kameron Yost any commands because Kameron Yost simply stepped out, put his hands behind his back, and Defendant Wilhoit handcuffed him. [*Id.* at ¶ 52].[6] Defendant Wilhoit walked Kameron Yost over to the front of his police vehicle, and at that point, other units arrived, including Police Chief Danny Green ("Chief Green") with the Tusculum Police Department. [*Id.* at ¶ 33]. Defendant Wilhoit did not have any more interaction with Keaton Yost or Kameron Yost from that point on. [*Id.* at ¶ 34]. Chief Green secured Kameron Yost in the back of his City of Tusculum vehicle. [*Id.* at ¶ 35]. According to Kameron Yost, he sat in the City of Tusculum vehicle for "probably six or seven minutes or longer." [Doc. 81-9 at 21].

Further, the parties agree to the following facts: (1) the force Defendant Wilhoit used on Keaton Yost and Kameron Yost when he secured them at the scene was limited to touching their arms for purposes of handcuffing and escorting/walking them, (2) Defendant Wilhoit did not strike, hit, or have any other contact with Keaton Yost or Kameron Yost either before or after they were handcuffed other than with a hand on an arm as they walked, and (3) Defendant Wilhoit never drew his service weapon or any other weapon. [Doc. 83 at ¶¶ 39, 45, 46]. The parties further agree that Kameron Yost never had any injuries on his person as a result of his encounter with

---

[6] In Defendants' Statement of Undisputed Material Facts, they also assert, and Plaintiffs agree, that Defendant Wilhoit secured Kameron Yost in the front passenger seat with handcuffs without incident. [Doc. 83 at ¶ 31]. Thus, it is not clear if Defendant Wilhoit placed the handcuffs on Kameron Yost when he was still in the vehicle or when he stepped out, but regardless, this fact is not relevant for purposes of summary judgment.

5

Defendant Wilhoit that day and that Keaton Yost had a bruise, slightly larger than a quarter, on his upper left arm that lasted a couple of days. [*Id.* at ¶¶ 53, 61].

When Howard Yost arrived on the scene, he admitted that he was driving the vehicle when Defendant Wilhoit observed it in the school parking lot and driving into the subdivision. [*Id.* at ¶ 36].[7] Following Howard Yost's admission, Keaton Yost and Kameron Yost were released. [Doc. 111 at ¶ 13]. Defendant Wilhoit arrested Howard Yost and charged him with reckless endangerment pursuant to Tennessee Code Annotated § 39-13-103 and felony evading arrest pursuant to Tennessee Code Annotated § 39-16-603. [Doc. 81-5 at 5].[8] Subsequently, Howard Yost's reckless endangerment charge was reduced to speeding in a school zone, and the evading arrest charge was dismissed. [Doc. 81-1 at 1].

The parties also submitted video footage from Chief Green's body camera taken on August 24, 2017. The footage is approximately seven minutes and thirty-five seconds long.[9] It begins

---

[7] The Court notes that in his Affidavit, Howard Yost claims Defendant Wilhoit asked who was driving and when Plaintiff Howard Yost admitted that he was driving earlier, Defendant Wilhoit responded, "Don't f****** lie to me, somebody's f****** going to go to jail." [Doc. 111 at ¶ 13]. This statement, however, is inconsistent with Howard Yost's deposition testimony, where he testified, "[Defendant Wilhoit] said, don't f****** lie to me. That was about it." [Doc. 111-2 at 2].

[8] The incident report states that Defendant Wilhoit observed a Hummer moving erratically at an excessive speed and did not stop at a stop sign. [Doc. 81-5 at 7]. The incident report continues, "Got him on radar 47/15." [*Id.*]. In an Affidavit, Howard Yost states that Defendant Wilhoit "admitted later in Greene County, Tennessee, General Sessions Court, in front of Judge Kenneth N. Bailey, Jr., **THAT HE DID NOT HAVE A RADAR**." [Doc. 106 at ¶ 23(a)] (Emphasis in original). This statement appears to be inconsistent with Howard Yost's deposition testimony that during court, he did not hear Defendant Wilhoit say anything. [Doc. 111-2 at 3]. Plaintiff Howard Yost testified, "[Defendant Wilhoit] kept over on the bench looking at his phone and I kept over there on the far side of the courtroom. I think only the DA and the lawyer was going back and forth between him and the judge." [*Id.*].

[9] There is no sound with respect to the first seventeen seconds of the footage. The Court also notes that several conversations are difficult to hear given the background noises as the incident took place next to a busy highway.

6

with Defendant Wilhoit having a discussion with Howard Yost, who is already in handcuffs. Keaton Yost is also still in handcuffs, and Howard Yost is pleading with the officers to let Keaton Yost go. Defendant Wilhoit asks an officer to check Keaton Yost and then to let "them two" (presumably Kameron Yost and Keaton Yost) go. Approximately forty (40) seconds into the video, an officer takes the handcuffs off Keaton Yost.

Chief Green asks Defendant Wilhoit, "Where was he when he finally stopped?" Defendant Wilhoit responds that the "boys came up behind me." Chief Green then approaches Kameron Yost, who is sitting in the back of Chief Green's vehicle in handcuffs. Chief Green asks Kameron Yost to explain what happened. Kameron Yost states that they (Plaintiffs) went home, and Howard Yost slammed the door, and stated, "Here is the truck." Kameron Yost states that Keaton Yost got into the driver side and on their way back to school, they saw a cop and Keaton Yost stated, "Oh crap, he is looking for dad." Approximately two minutes and forty seconds into the video, Chief Green takes the handcuffs off Kameron Yost's wrists and reports to Defendant Wilhoit what Kameron Yost stated. Chief Green asks Kameron Yost what Howard Yost was mad about, and Kameron Yost stated that Howard Yost was mad because Keaton Yost wanted to drive the Hummer.

Chief Green begins talking with Howard Yost, who also explains what happened. Howard Yost states that Keaton Yost wanted to drive that day, and Howard Yost did not have another vehicle. Howard Yost states that he and Keaton Yost got into an argument because Keaton Yost did not want to be dropped off and Howard Yost had to go to the bathroom. Howard Yost states that he was taking the boys to school and that he needed to go back home to go to the bathroom.

Chief Green approaches Defendant Wilhoit, who asks whether Howard Yost is related to someone important. Chief Green responds, "No," and the other officers discuss whether they know

of any familial relations to Howard Yost. Defendant Wilhoit states that he is going to arrest Howard Yost and further states, "I know we are being recorded." The other officers continue to discuss Howard Yost's familial relations. Defendant Wilhoit asks another officer to call the jail. Defendant Wilhoit states that the reckless driving started in the high school parking lot. Chief Green asks Defendant Wilhoit if the boys were not going to school why was Howard Yost in the parking lot. Defendant Wilhoit states, "See, that does not make any sense. Because they were flying in the high school parking lot." Defendant Wilhoit states that Plaintiffs continued to "fly all the way down." Another officer asks whether Howard Yost was driving, and Defendant Wilhoit states that Howard Yost acknowledged that he was driving and that Defendant Wilhoit was "going to take his word for it." Chief Green then asks Howard Yost for clarification.

Howard Yost states that he was taking Kameron Yost and Keaton Yost to school. Howard Yost explains that they arrived at the school and that he got mad, so they returned to the house, but the boys were going back to school. Howard Yost states that he and Keaton Yost were arguing because Keaton Yost did not want to be dropped off at his girlfriend's car. Howard Yost further explains that he was unaware that Keaton Yost did not want to be dropped off, and that Howard Yost had to go to the bathroom, so Howard Yost decided to just go back home.

Afterwards, Chief Green asks Defendant Wilhoit what crimes Defendant Wilhoit plans to charge. Defendant Wilhoit says reckless driving and asks whether he can arrest Howard Yost for that charge, to which Chief Green states, "Yeah." Defendant Wilhoit then states that he could charge Howard Yost with reckless endangerment because the "boys" were in the vehicle. Defendant Wilhoit asks Chief Greene "if that's pushing it" and Chief Greene responds, "No, it's not." Chief Green recommends that Defendant Wilhoit send Howard Yost to court instead of arresting him because the crime is a misdemeanor. Chief Greene continues, "But, it's up to you.

If you think it's bad enough to arrest, that's fine." Defendant Wilhoit then calls someone on his radio. Afterwards, Defendant Wilhoit states that he is going to arrest Howard Yost. Chief Green states, "Fine, are you charging him with felony evasion?" Although not quite audible, it appears that Defendant Wilhoit is still confused about the events (*i.e.,* Howard Yost admitted to speeding but was not the driver of the Hummer when Defendant Wilhoit made the stop). Chief Green responds that "in the course of the investigation, [Howard Yost] admitted he was driving." Chief Green further states, "And they are going to reduce it, but I would go ahead." A few seconds later, the video cuts off.

Approximately three (3) years after the above incident, Keaton Yost treated with a nurse practitioner for anxiety. [Doc. 83 at ¶ 65]. The nurse practitioner prescribed Keaton Yost anxiety medication, but he stopped taking it around August 2020. [*Id.* at ¶ 66]. The nurse practitioner has not opined that Keaton Yost's anxiety was related to the above incident. [*Id.* at ¶ 67]. Further, Howard Yost has not treated with any mental health professionals, and he does not have any medical expenses that he is attributing to the August 24, 2017 incident. [*Id.* at ¶ 68]. Finally, Kameron Yost has never treated with any mental health medical professional. [Doc. 81-9 at 5].

## II.    STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Defendant Wilhoit also asserts qualified immunity as a defense. "Qualified immunity shields federal and state officials from money damages unless a plaintiff alleges facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Cunningham v. Shelby Cty., Tennessee,* 994

10

F.3d 761, 764 (6th Cir. 2021).  The Court may answer the questions in any order. *Id.*  "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016).  Once a defendant has raised qualified immunity, however, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

## III.    ANALYSIS

Accordingly, for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment [**Doc. 81**].

To begin with, the Court notes that the parties agree that the Commission and the Board should be dismissed from this cause of action. *See* [Doc. 106 at 1] ("Plaintiffs concede that no genuine issues of material fact exist and that summary judgment should be granted as a matter of law dismissing all [D]efendants EXCEPT for Wayne Wilhoit and Greene County, Tennessee.") (Emphasis in original).  Accordingly, given the parties' representations, the Court **DISMISSES** Defendants Greene County Commission and the Greene County School Board from this action.

The Court will now turn to the arguments relating to the remaining Defendants, Wilhoit and the County.

### A.    Plaintiff Howard Yost's False Arrest/Unlawful Seizure Claim

Defendants assert that they are entitled to summary judgment on Howard Yost's false arrest/unlawful seizure claim because he pleaded guilty to speeding in a school zone, and therefore, Defendant Wilhoit had probable cause to lawfully seize him.  Defendants argue that as a result,

Howard Yost's claim under the Fourth Amendment for unlawful seizure/false arrest is rendered meritless.

Plaintiffs argue that Howard Yost should have never been arrested and that a mere citation was sufficient in this case. Plaintiffs state that while the facts and circumstances show that Howard Yost was speeding, this is not an arrestable offense in Tennessee.

"It has long been true that the Fourth Amendment requires probable cause for an arrest." *Lyons v. City of Xenia*, 417, F.3d 565, 573 (6th Cir. 2005). "'Probable cause' means that the facts and circumstances within the officer's knowledge are sufficient to warrant a reasonably prudent person to believe, in the circumstances shown, that the suspect has committed or is about to commit the offense." *Patrizi v. Huff*, 821 F. Supp. 2d 926, 932 (N.D. Ohio 2011), *aff'd,* 690 F.3d 459 (6th Cir. 2012) (other citations omitted). To prevail on a false arrest claim under 42 U.S.C. § 1983, "a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).

As mentioned above, Defendants argue that there was probable cause to arrest Howard Yost. As a threshold matter, the parties dispute whether Howard Yost evaded arrest, and the Court finds genuine issues of material fact as to whether he actually evaded arrest. According to Plaintiffs, they did not see or hear Defendant Wilhoit activate his blue lights or his siren and that at no time during the drive back home was there law enforcement behind the Hummer. Defendant Wilhoit states that he activated his blue lights and siren to pull Plaintiffs over, but they failed to pull over, and Defendant Wilhoit lost pursuit of the Hummer in the Meadowbrook subdivision. In Tennessee, pursuant to the evading arrest statute, "It is unlawful for any person, while operating a motor vehicle on any street, road, alley, or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the

12

vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1). Here, there are genuine issues of material fact as to whether Plaintiffs "received any signal from [Defendant Wilhoit] to bring the vehicle to a stop." Tenn. Code. Ann. § 39-16-603(b)(1).[10]

Defendants argue, however, that these facts are irrelevant because there is no dispute that Howard Yost was speeding and that he pleaded guilty to speeding in a school zone. In support of their position, Defendants rely on *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001). Specifically, in *Atwater*, the Supreme Court held that "the Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine." *Id.* at 318. In *Atwater*, the plaintiff was driving with her children in the front seat, and no one was wearing a seatbelt. *Id.* at 324. Pursuant to Texas law, a front-seat passenger must wear a seatbelt, and the driver must secure any small child riding in the front seat. *Id.* at 323. Violation of the seatbelt law was punishable by a fine, but the law allowed the officer the discretion to either issue a citation or make an arrest if a person was in violation thereof. *Id.*

An officer approached plaintiff's truck and stated that plaintiff was going to jail. *Id.* at 323-24. The officer called for backup and asked to see plaintiff's driver's license and insurance documentation. *Id.* at 324. The plaintiff did not have her papers because her purse had been stolen the day before, to which the officer responded that he "heard that story two-hundred times." *Id.* The officer handcuffed plaintiff and took her to jail. *Id.* The plaintiff was charged with driving without a seatbelt fastened, failing to secure her children in seatbelts, driving without a license, and failing to provide proof of insurance. *Id.* The plaintiff pleaded no contest to the misdemeanor seatbelt offense and paid a $50 fine, and the other charges were dismissed. *Id.*

---

[10] The parties do not sufficiently discuss the reckless endangerment charge, but this appears to be based on Howard Yost's manner of driving on August 24, 2017, but this too is disputed.

13

The plaintiff filed a complaint, alleging violations of 42 U.S.C. § 1983 with respect to her right to be free from unreasonable seizures. *Id.* at 325. The Supreme Court addressed "whether the Fourth Amendment, either by incorporating common-law restrictions on misdemeanor arrests or otherwise, limits police officers' authority to arrest without warrant for minor criminal offenses." *Id.* at 326. After providing an exhaustive discussion of common law, the Court held that the officer's actions did not violate the Fourth Amendment. *Id.* at 354. The Court found that the plaintiff's request for a modern arrest rule (*i.e.*, "forbidding custodial arrest, even upon probable cause, when conviction could not ultimately carry any jail time and the government shows no compelling need for immediate detention") not well taken because the Fourth Amendment is "not well served by standards requiring sensitive, case-by-case determinations of government need." *Id.* at 346-47.

Further, the plaintiff argued that the Court should draw a distinction between jailable and fine-only offenses, but the Court declined the plaintiff's invitation, explaining, "The trouble with this distinction, of course, is that an officer on the street might not be able to tell." *Id.* at 348. The Court explained, "It is not merely that we cannot expect every police officer to know the details of frequently complex penalty schemes . . . but that penalties for ostensibly identical conduct can vary on account of facts difficult (if not impossible) to know at the scene of an arrest." *Id.* at 349. The Court ultimately held, "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.* at 354.

Subsequently, the Supreme Court addressed a similar issue in the context of a non-arrestable offense. *Virginia v. Moore*, 553 U.S. 164 (2008). In *Moore*, the Supreme Court considered "whether a police officer violates the Fourth Amendment by making an arrest based on

14

probable cause but prohibited by state law." *Id.* at 166. Specifically, in *Moore*, officers pulled the defendant over, who was driving on a suspended license. *Id.* The officers arrested the defendant and subsequently searched his vehicle and found crack cocaine and cash. *Id.* at 166. In Virginia, driving with a suspended license is punishable by a year in jail or a $2,500 fine, but under state law, the officers should have issued the defendant a summons instead of arresting him. *Id.* Thus, in his criminal case, the defendant filed a motion requesting that the evidence be suppressed pursuant to the Fourth Amendment. *Id.* 167-68. The Virginia Supreme Court held that because "the arresting officers should have issued [the defendant] a citation under state law, the Fourth Amendment does not permit search incident to citation," and therefore, "the arrest violated the Fourth Amendment." *Id.* at 168.

The Supreme Court reversed, relying, in part, on *Atwater*. The Court explained, "Even if we thought that state law changed the nature of the Commonwealth's interests for purposes of the Fourth Amendment, we would adhere to the probable-cause standard." *Id.* at 174-75. The Court further reasoned that "[i]ncorporating state-law arrest limitations into the Constitution would produce a constitutional regimen no less vague and unpredictable than the one we rejected in *Atwater*. The constitutional standard would be only as easy to apply as the underlying state law, and state law can be complicated indeed." *Id.* at 175. In addition, the Court noted that "*Atwater* differs from this case in only one significant respect: It considered (and rejected) federal constitutional remedies for all minor misdemeanor arrests; [the defendant] seeks them in only that subset of minor-misdemeanor arrests in which there is the least to be gained—that is, where the State has already acted to constrain officers' discretion and prevent abuse." *Id.* at 176. The Court found that there was a "less of a need for redress" than in *Atwater*. *Id.*

Finally, the Court explained that "linking the Fourth Amendment protections to state law would cause them to 'vary from place to place and from time to time." *Id.* (quoting *Whren v. United States*, 517. U.S. 806, 815 (1996)).  Accordingly, the Court concluded "that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176.

In the present matter, the parties do not dispute that Defendant Wilhoit observed a Hummer going over the speed limit in a school zone, Howard Yost was the driver of the Hummer and was speeding, and Howard Yost ultimately pleaded guilty to speeding.  Based on the above authority, the Court finds that Howard Yost's arrest does not violate the Fourth Amendment.  The Court further finds that Keaton Yost's and Howard Yost's Affidavits do not change this conclusion. According to Keaton Yost, "At no time did my father *appear* to be speeding." [Doc. 106 at 4] (Emphasis added).  Howard Yost states that a Mustang was in front of his vehicle and that he was going the exact speed that the Mustang was traveling.  [*Id.* at 6-7].  These statements, however, are not the equivalent of stating that Howard Yost was not speeding.  Further, Plaintiffs cannot now deny that Howard Yost was speeding as such would be wholly inconsistent with Howard Yost's deposition testimony, where he testified that the speed limit was fifteen (15) miles an hour and that he was going "a tad" over the speed limit.  [Doc. 81-7 at 12].  Finally, as mentioned above, Howard Yost pleaded guilty to speeding.  [Doc. 81-1 at 1].  In light of the evidence in this case, the Court finds Defendants' arguments well taken.

As a final matter, the Court finds Plaintiffs' reliance on *Devenpeck v. Alford*, 543 U.S. 146 (2004) misplaced.  Plaintiffs state that "*Devenpeck* has been misconstrued as providing a shield for police officers and governments" but that the opinion "reiterate[s] the long-held tenet that

probable cause is an objective standard, which bolsters plaintiffs' theory that what is objectively correct for a police officer to do in a certain situation is a jury question."  [Doc. 109 at 7].  In *Devenpeck*, officers believed that plaintiff committed several offenses, but they only arrested and charged him with an offense that was later dismissed. *Id.* at 149.  The plaintiff filed a § 1983 claim against the officers, but the Supreme Court concluded that the warrantless arrest was valid so long as the officers had probable cause to arrest him for any crime based on the facts within their knowledge. *Id*. at 153-54.  The Court finds that the ruling in *Devenpeck* supports the Court's disposition of the instant issue because there is no dispute that Defendant Wilhoit observed Howard Yost speeding in a school zone.  Accordingly, the Court finds Defendants are entitled to summary judgment on Howard Yost's § 1983 action for unlawful seizure/false arrest.

## B. Malicious Prosecution Claim

Defendants argue that because there was probable cause to arrest Howard Yost, his malicious prosecution claim fails.  Plaintiffs do not respond to this argument.  In their reply, Defendants assert that by failing to respond to their argument, Plaintiffs have abandoned their claims.

The Sixth Circuit has set forth the following elements with respect to a malicious prosecution claim under the Fourth Amendment:

> (1) that a criminal prosecution was initiated against the plaintiff and defendant made, influenced, or participated in the decision to prosecute, (2) that there was a lack of probable cause of the criminal prosecution, (3) that as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure, and (4) that the criminal proceeding must have resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.2d 294, 308-09 (6th Cir. 2010) (internal quotations omitted).

17

In the present matter, the Court agrees with Defendants that Plaintiffs have abandoned their claim, and the Court further finds that Defendants have shown that no genuine issue of material fact exists. *See Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568–69 (6th Cir. 2015) ("We also hold that Plaintiff abandoned her due process claim by failing to address it in her motion for summary judgment and by failing to respond to Defendants' summary judgment motion in which they argued that the claim was meritless.") (citing *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th Cir. 2013)) ("[A] plaintiff is deemed to have abandoned a claim when [she] fails to address it in response to a motion for summary judgment."). In addition, as Defendants have argued, there is no dispute that Howard Yost was speeding and that he pleaded guilty to speeding. *See also Burden v. Paul*, 493 F. App'x 660, 663 (6th Cir. 2012) ("An officer is entitled to qualified immunity when probable cause supports the suspect's arrest on some offense, even if it is not the offense of arrest."). Accordingly, the Court finds Defendants are entitled to summary judgment on Howard Yost's malicious prosecution claim.

### C.  Keaton Yost's and Kameron Yost's Detention

Defendants argue that Defendant Wilhoit had sufficient reasonable suspicion to temporarily detain Keaton Yost and Kameron Yost because all parties agree that the vehicle leaving the school zone parking lot and traveling on public roads exceeded the posted speed limit for school zones, ran at least one stop sign, and was able to get away from a pursuing police vehicle.

Plaintiffs argue that they have established that they did not engage in felonious behavior. Plaintiffs state that Defendant Wilhoit's actions of detaining them longer than the period necessary for a simple traffic violation or placing them in handcuffs were not warranted. Plaintiffs claim that they were detained for an unreasonable amount of time.

18

The Fourth Amendment protects people against unreasonable seizures.  U.S. Const. amend. IV.  A police officer may briefly stop a suspect to investigate as long as the stop is within the bounds of *Terry v. Ohio*, 392 U.S. 1 (1968).  "A proper basis for a *Terry* stop exists where, under the totality of the circumstances, the officer has a 'reasonable, articulable suspicion that [a] person *has been,* is, or is about to be engaged in criminal activity.'" *Kowolonek v. Moore*, 463 F. App'x 531, 534 (6th Cir. 2012) (quoting *United v. Smith,* 594 F.3d 530, 536–37 (6th Cir. 2010)).  When evaluating a *Terry* stop, the Court must review "whether there was a proper basis for the stop," and if so, "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand."  *Smith*, 594 F.3d at 536 (internal quotations omitted).  Finally, in order "[t]o determine whether the intrusion was reasonably related in scope to the situation at hand, we look to whether the stop was sufficiently limited in time and whether the investigative means used [were] the least intrusive means reasonably available."  *Kowolonek,* 463 F. App'x at 534 (internal quotations omitted).

The Court will first determine whether the stop was sufficiently limited in time.  As an initial matter, Plaintiffs do not specifically explain why the temporary detention of Keaton Yost and Kameron Yost was unreasonable in violation of the Fourth Amendment.  Instead, Plaintiffs generally assert that Keaton Yost and Kameron Yost "were detained for an unreasonable time. They were detained because the Greene County Sheriff's Department was attempting to trump up charges against their father."  [Doc. 109 at 6].  Based on the evidence in this case, however, the Court does not find Keaton Yost's and Kameron Yost's brief detention unreasonable.

Defendants assert that Keaton Yost and Kameron Yost were detained for approximately ten (10) minutes.  While the Court is hesitant to find a specific length of time, the Court can find

19

based on the evidence in the record that Keaton Yost's and Kameron Yost's detention was brief.[11]
Here, the undisputed facts show that Defendant Wilhoit observed a Hummer speeding in a school
zone and failing to stop at a stop sign.  He was not able to identify the driver, and he lost sight of
the Hummer several times—the last time was when the Hummer entered into the Meadowbrook
subdivision.  Defendant Wilhoit entered the Meadowbrook subdivision but lost sight of the
Hummer, and he decided to return to the high school.  When Defendant Wilhoit was exiting the
Meadowbrook subdivision, the Hummer pulled behind Defendant Wilhoit's vehicle, and
Defendant Wilhoit effectuated a stop.

Defendant Wilhoit approached the Hummer and found Keaton Yost in the driver's seat.
Defendant Wilhoit told Keaton Yost to throw the keys out of the vehicle and to step out.  Keaton
Yost complied, and Defendant Wilhoit handcuffed Keaton Yost and placed him beside his police
cruiser.  During this time, Kameron Yost was on his cellphone with Howard Yost.  Next, Defendant
Wilhoit handcuffed Kameron Yost and walked him over to the front of the police cruiser.
Defendant Wilhoit did not have any further interactions with Keaton Yost or Kameron Yost, and
other officers arrived.  Howard Yost arrived at the scene within two to three minutes of Kameron
Yost calling him and acknowledged that he was driving the Hummer when Defendant Wilhoit
observed it in the high school parking lot.  After Howard Yost admitted that he was the driver,
Defendant Wilhoit directed the other officers to release Keaton Yost and Kameron Yost.  Kameron
Yost testified that he was in the back of the police cruiser for "probably six or seven minutes or
longer."  [Doc. 81-9 at 21].

---

[11] For instance, it is not entirely clear when Chief Green's body camera begins recording
because when the footage begins, Howard Yost is already in handcuffs.

As mentioned above, Plaintiffs state that Keaton Yost and Kameron Yost were seized for an unreasonable amount of time, but they do not explain why the length of time was unreasonable under the circumstances. While "[t]here is no rigid time limit for a *Terry* stop," *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d. 809, 815 (6th Cir. 1999), the Court finds Keaton Yost's and Kameron Yost's temporary detention reasonable under the circumstances. *See Kowolonek*, 463 F. App'x at 536 (finding that plaintiff's five-minute detention was reasonable because the officers used the five minutes to investigate what had occurred).

In the present matter, Defendant Wilhoit observed the Hummer commit several traffic violations, and during the course of his investigation, he learned that Howard Yost, who was not in the vehicle when Defendant Wilhoit effectuated the stop, committed the violations. After learning that Howard Yost was the driver, the officers released Keaton Yost and Kameron Yost. Accordingly, the Court finds Defendants' argument is well taken with respect to the length of detention.

The Court must now turn to whether Defendant Wilhoit's investigative means were the least intrusive means reasonably available. With respect to Keaton Yost, the Court finds that his claim fails for the same reasons Howard Yost's claim fails. Specifically, there was probable cause to arrest Keaton Yost for speeding and failing to stop at a stop sign. As explained above, Defendant Wilhoit observed a Hummer speeding, and when he later effectuated a stop on the Hummer, Keaton Yost was in the driver's seat. Thus, at that time, Defendant Wilhoit had probable cause to believe Keaton Yost committed the traffic violations, and therefore, using handcuffs on Keaton Yost did not offend the Fourth Amendment.

The same, however, cannot be said about Kameron Yost's claim. Kameron Yost was merely a passenger and did not violate any traffic laws. The Sixth Circuit has explained that

handcuffing a suspect and/or detaining the suspect in a police car is reasonable under *Terry* if the officer is concerned for his safety or if the occupants present a flight risk. *Kowolonek*, 463 F. App'x at 536-37. Here, there is no evidence before the Court that Plaintiffs presented a threat to Defendant Wilhoit's safety. In addition, whether Keaton Yost and Kameron Yost presented a flight risk is a question of fact. As stated above, the parties dispute whether Defendant Wilhoit was actively pursuing Plaintiffs, and therefore, the Court cannot find based on the record that Kameron Yost's seizure was constitutional.

The inquiry, however, does not end there. Even if there was a constitutional violation, Defendant Wilhoit is entitled to qualified immunity if the right is not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 537 (other citations omitted). This generally means that a case has been decided "with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." *Vanderhoef v. Dixon*, 938 F.3d 271 (6th Cir. 2019) (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)). A case explaining general propositions, such as an unreasonable search or seizure violates the Fourth Amendment is not helpful in this analysis. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Although a case does not need to be the same situation, "the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted).

The Court has strongly considered whether Plaintiffs have failed to meet their burden in showing that Defendant Wilhoit is not entitled to qualified immunity given their lack of citation to any relevant case. It is well established that a plaintiff has the burden to defeat qualified immunity once it has been raised. In considering whether Plaintiffs' inadequate briefing forfeits their claim, however, the Court is not allowed to ignore established law. *Elder v. Holloway,* 510 U.S. 510, 516

22

(1994) (concluding that whether a federal right was clearly established at a particular time is a question of law, and therefore, a court should use "its full knowledge of its own [and other relevant] precedents") (quoting *Davis v. Scherer*, 468 U.S. 183, 192, n. 9 (1994)).  The Western District of Tennessee recently addressed a similar issue, stating that while defendant contends that plaintiff has not cited any case that shows the constitutional right was established, "[t]he Court has a duty to conduct its own review of relevant precedent to determine whether an asserted right was clearly established."  *Stewart v. City of Memphis*, No. 2:16-CV-02574-SHM, 2019 WL 332812, at *10 (W.D. Tenn. Jan. 25, 2019), *aff'd sub nom. Stewart v. City of Memphis, Tennessee*, 788 F. App'x 341 (6th Cir. 2019).  In relying on *Elder*, the court further explained, "Like all questions of law, a district court's analysis is not limited to the precise contours of a plaintiff's legal argument. District courts, like circuit courts, have a duty to undertake their own review of all relevant precedents."  *Id.* (quotations omitted).

Given the above, and despite Plaintiffs' lack of citation to relevant authority, the Court must determine whether Defendant Wilhoit violated Kameron Yost's clearly established Fourth Amendment right to be free from unreasonable seizure.  In viewing the light most favorable to Plaintiffs, which the Court is required to do, the Court finds the Defendant Wilhoit violated Kameron Yost's clearly established right.  It is well established that an officer may use handcuffs during a *Terry* stop as long as the circumstances warrant the use of handcuffs.  *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 309 (6th Cir. 2005).  "[T]he Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005).

Specifically, in *Bennett*, an officer observed a group of youths (including two of the plaintiffs) riding on bicycles with one of the bikes occupied by two youths, which was a violation of state law. *Id.* at 834. The officer also believed the youths were casing the front of a store. *Id.* at 835. After stopping the group, the officer frisked, handcuffed, and detained them in the back of the police cruiser. *Id.* Two of the youths filed § 1983 claims, alleging violations of the Fourth Amendment. *Id.* at 834-35. In analyzing the plaintiffs' claims, the Sixth Circuit noted that using "handcuffs during a *Terry* stop may be permissible so long as the circumstances warrant the restraint." *Id.* at 837. The Court concluded as follows:

> In addition to the fact that the officers had no reasonable belief that the youths were armed and dangerous, they have alleged no facts that would indicate that the youths attempted to flee or do anything else that would warrant their use of force. In sum, we see no circumstances here warranting the handcuffs as a reaction for officer safety or otherwise and therefore conclude that the use of handcuffs during this *Terry* stop violated the plaintiffs' Fourth Amendment rights.

*Id.*

Similarly, in *Harris v. Langley*, the Sixth Circuit held that plaintiff's detention was unreasonable under the Fourth Amendment when there were no articulable facts or law supporting enforcement interests. 647 F. App'x 585, 592 (6th Cir. 2016). Specifically, in *Harris*, the plaintiff dialed 911 twice to report that his mother needed a medical evaluation. *Id.* at 586. Two officers arrived at plaintiff's residence, instead of medical personnel. *Id.* at 587. According to the plaintiff, when the officers arrived, he told them that he had requested medical personnel and not police assistance. *Id.* The plaintiff invited the officers in, but they declined. *Id.* When the plaintiff began to close the door, one of the officers opened the door and got in the plaintiff's face. *Id.* The other officer then body-slammed the plaintiff and knocked him to the floor on his back. *Id.* The same officer then placed his left knee on the plaintiff's back, grabbed plaintiff's wrist, and handcuffed

him.  *Id.*  The officer claimed that plaintiff had used vulgar language.  *Id.*  The plaintiff was only handcuffed for approximately two (2) minutes.  *Id.*

The plaintiff filed suit claiming unlawful detention under the Fourth Amendment.  *Id.* at 590.  The court explained that when there is "limited intrusion on a person's liberty but no formal arrest, that intrusion [must] be justified by something less than probable cause."  *Id*. at 591.  The Court found, however, that there was no need to detain plaintiff.  *Id.*  The Court reasoned that there was no "interest in minimizing the risk of harm to the officers . . . because there was no credible threat to the police officers' safety, . . . there was no viable concern that [the plaintiff] was engaged in wrongdoing, . . . nor was there any legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found."  *Id*. at 592 (internal quotations omitted).  The Court concluded the plaintiff's seizure was demonstrably unreasonable under the Fourth Amendment and that the officer was not entitled to qualified immunity.  *Id.*

Here, Defendant Wilhoit observed the Hummer speeding and rolling through a stop sign. When he later effectuated a stop, he immediately placed Kameron Yost, the passenger, in handcuffs.  As the passenger, Kameron Yost did not violate any traffic laws, and Defendant Wilhoit has not articulated any undisputed facts that would warrant placing Kameron Yost in handcuffs.  Specifically, there are no undisputed facts in the record to suggest that Kameron Yost, or anyone in the vehicle, was armed or dangerous.  In addition, there are disputed facts in the record with respect to whether Defendant Wilhoit was pursuing the Hummer and whether the occupants in the vehicle were fleeing Defendant Wilhoit's pursuit.  If believed, such would entitle Defendant Wilhoit to qualified immunity on Kameron Yost's claim.  *United States v. Norton*, No. 2:19-CR-145, 2021 WL 769329, at *3 (E.D. Tenn. Feb. 18, 2021) ("Courts have found that officers may temporarily detain all occupants of a fleeing vehicle for the safety of officers

during a temporary detention."), *report and recommendation adopted*, No. 2:19-CR-145, 2021 WL 744403 (E.D. Tenn. Feb. 25, 2021), *objections overruled*, No. 2:19-CR-145, 2021 WL 966357 (E.D. Tenn. Mar. 15, 2021), and *appeal dismissed*, No. 21-5210, 2021 WL 2285041 (6th Cir. Mar. 9, 2021) .

As previously mentioned, however, this issue is disputed, and in viewing the facts in the light most favorable to Plaintiffs, the Court finds summary judgment on Kameron Yost's unlawful seizure claim not warranted.

### D.      Keaton Yost's and Kameron Yost's Excessive Force Claims

Defendants argue that Keaton Yost's and Kameron Yost's excessive force claims are based on outright falsehoods.  Defendants assert that with respect to Keaton Yost, it is undisputed that he never made any complaints of pain during the incident, and there is no evidence that he experienced physical injury other than a bruise slightly larger than a quarter that lasted a couple of days.  With respect to Kameron Yost, Defendants assert that it is undisputed that he did not experience any physical injury during the incident.

While the Complaint in this matter included excessive force claims, Plaintiffs failed to respond to Defendants' arguments that such claims should be dismissed.  Accordingly, the Court finds that by failing to respond, Plaintiffs have abandoned these claims.  *See Haddad*, 610 F. App'x at 568–69; *Brown,* 545 F. App'x at 372.  In addition, the Court observes that the unrebutted evidence shows that no excessive force was used on Keaton Yost.  Further, in paragraph 113 of the Complaint, Kameron Yost claims that his handcuffs "were tightened to the point of significant pain, . . . despite verbal indications of pain to Wilhoit."  [Doc. 1 at ¶ 113].   Plaintiffs did not address this allegation in their response, and during Kameron Yost's deposition, he testified that he was not in any pain at all that day.  [Doc. 81-9 at 22]; *see also* [Doc. 83 at ¶ 56] (stating that

Kameron Yost was not in any pain).  Accordingly, the Court finds summary judgment on Keaton Yost's and Kameron Yost's excessive force claims appropriate.

E.    **Municipal Liability**

Defendants argue that Plaintiffs have no personal knowledge of the County's policies or procedures, and therefore, there is no basis for imposition of municipal liability.  Defendants state that the Complaint alleges the following: (1) that Defendant Wilhoit did not possess the requisite training, experience or certifications; (2) that the entity Defendants disregarded state law standards for the hiring, supervision, retention, and training of a school resource officer; (3) that the entity Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of individuals, which were moving forces behind and proximately caused a violation of Plaintiffs' constitutional federal rights; and (4) that Defendant Wilhoit was an individual merely with training as a security officer with no prior patrol experience or other experience of a seasoned officer.

Defendants argue that there is no evidence to support the above allegations and that the record reveals that the claims are not accurate.  For instance, Defendants point to Defendant Wilhoit's career, his training, and the fact that there is no evidence of previous complaints against Defendant Wilhoit for improper seizure or using excessive force.  In addition, Defendants state that because Plaintiffs cannot prove a violation of a constitutional right, municipal liability cannot attach.  Finally, Defendants argue that under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), the County is not liable.

Plaintiffs do not respond to Defendants' arguments regarding Defendant Wilhoit's training. Plaintiffs state, however, that a reasonable factfinder would find that the Greene County Sheriff's

27

Department has a policy of intentionally overcharging defendants as stated by Chief Green on the video.

It is well established that a municipal may not be held liable under § 1983 on a respondeat superior theory. *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014). To demonstrate *Monell* liability, one must: (1) identify the policy or custom; (2) connect the policy to the governmental entity; and (3) show causality—i.e., that an injury of a constitutional magnitude occurred because of that policy or custom's execution. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (internal citations omitted).

As an initial matter, the Court notes that Plaintiffs failed to argue that Defendant Wilhoit was improperly trained, and they have not provided any evidence to support their allegation that he was improperly trained. Instead, Plaintiffs assert that as stated by Chief Green on the video, the County has a policy of intentionally overcharging suspects, citing to the 7:26 mark on the video. The Court has considered Plaintiffs' argument, along with the video, and finds summary judgment on Plaintiffs' municipal liability claims appropriate.

The Court notes that a few minutes prior to the 7:26 mark, Chief Green is talking to Plaintiffs and then asks Defendant Wilhoit what crimes Defendant Wilhoit plans to charge. Defendant Wilhoit responds reckless driving and asks whether he can arrest Howard Yost for that charge, to which Chief Green responds, "Yeah." Defendant Wilhoit then states he could charge Howard Yost with reckless endangerment because the "boys" were in the vehicle. Defendant Wilhoit asks Chief Green "if that's pushing it," and Chief Green responds, "No, it's not." Chief Green recommends that Defendant Wilhoit send Howard Yost to court instead of arresting him because the crime is a misdemeanor. Chief Green continues, "But, it's up to you. If you think it's bad enough to arrest, that's fine." Defendant Wilhoit then calls someone on his radio. Afterwards,

Defendant Wilhoit states that he is going to arrest Howard Yost. Chief Green states, "Fine, are you charging him with felony evasion?" Although not quite audible, it appears that Defendant Wilhoit is still confused regarding how Howard Yost could be the driver given that he arrived at the scene after Defendant Wilhoit stopped the Hummer. Chief Green responds that in the course of the investigation, Howard Yost admitted that he was driving. Chief Green states, "And they are going to reduce it, but I would go ahead." A few seconds later, the video cuts off.

In the instant matter, Plaintiffs claim that the unconstitutional policy is overcharging suspects; however, there are two issues with Plaintiffs' argument. First, even if Defendant Wilhoit overcharged Howard Yost, Plaintiffs have not connected that "policy" to the County. Finding the County liable without such evidence would equate to a finding of respondeat superior. Second, while Plaintiffs rely on Chief Green's recommendation in support of their argument that Defendant Wilhoit overcharged Howard Yost, the Court finds that the evidence does not support such a finding. The fact that Chief Green made a recommendation, which Defendant Wilhoit did not follow, does not necessarily mean that Defendant Wilhoit overcharged Howard Yost. The Court further observes that Chief Green was not present during the offenses and the alleged felony evasion attempt. Accordingly, Plaintiffs' citation to the 7:26 mark on the video does not support their arguments, and the Court finds summary judgment is warranted as to the federal claims against the County.

F.     State Law Claims

Defendants move for summary judgment on Plaintiffs' state law claims, including assault and battery (Keaton Yost), battery (Kameron Yost), false imprisonment (all Plaintiffs), and intentional infliction of emotional distress (all Plaintiffs).[12]     Defendants argue that Defendant

---

[12] As Defendants noted in their brief, the Complaint alleges state law claims for negligent

Wilhoit is immune from suit with respect to Plaintiffs' state law claims under the Tennessee Governmental Tort Liability Act ("TGTLA"). In addition, Defendants argue that the facts do not support the state law claims. Plaintiffs did not respond to any of the challenges with respect to their state law claims. In reply, Defendants argue that Plaintiffs abandoned these claims.

The Court has again strongly considered whether Plaintiffs have abandoned their claims for failing to respond. The Court, however, must analyze these claims because it is Defendants' burden, as the moving parties, to show that summary judgment is appropriate. *Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) (finding that plaintiff did not abandon his claim against defendant by failing to respond because defendant has the burden as the party moving for summary judgment) (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded."). Accordingly, despite Plaintiffs' failure to respond, the Court will first determine whether Defendant Wilhoit is immune from suit and then turn to whether Defendants have shown that there are no genuine issues of material fact in dispute.

First, the Court does not find that Defendant Wilhoit is immune from these state law tort claims. Defendants argue that Defendant Wilhoit is immune from suit because the County does not have immunity. Specifically, the TGTLA extends immunity to employees of the government but only when the entity's immunity has been removed. *See* Tenn. Code Ann. § 29-20-310(b). "In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity." *Colson v. City of Alcoa, Tennessee*, No. 3:16-CV-377, 2017 WL 4019596, at *11 (E.D. Tenn. Sept. 11, 2017). It is well established that immunity is not removed

_____

hiring, training, and supervision against the Board and the Commission. [Doc. 82 at 33]. These parties, however, will be dismissed pursuant to Plaintiffs' representation. The Complaint does not make any such claims against the County.

for a governmental entity if the action arises out of civil rights violations. *Boddy v. City of Memphis, Tennessee*, No. 2:19-CV-02190, 2020 WL 4340228, at *6 (W.D. Tenn. July 28, 2020) (finding plaintiff's false imprisonment claim, false arrest claim, and intentional infliction of emotional distress claim were barred against the city because they arose out of the context of alleged civil rights violations); *Wynn v. City of Pulaski, Tenn.*, No. 1:11-0025, 2013 WL 527154, at *15 (M.D. Tenn. Feb. 11, 2013) ("[T]he City of Pulaski is entitled to immunity under the GTLA on Dr. Wynn's state law claims because they clearly arose and directly flow from her allegation that Defendants violated her civil right."), *aff'd sub nom. Wynn v. Estes*, 543 F. App'x 535 (6th Cir. 2013); *Uhuru v. City of Memphis*, No. 08-2150-V, 2008 WL 4646156, at *11 (W.D. Tenn. Oct. 17, 2008) ("The Uhurus' tort claims of false imprisonment and assault against the City under the GTLA are based upon the alleged violation of their civil rights by the defendant officers. Because they assert their false imprisonment and aggravated assault claims against the City in the context of a civil rights case, the alleged injuries must necessarily arise out of 'civil rights.' The City is entitled to immunity from suit on these claims pursuant to the "civil rights" exception in Tenn. Code Ann. § 29-20-205(2).").

In the instant matter, the Court finds that the Complaint arises out of alleged civil rights violations. Based on the above authority, the County has immunity with respect to the state law claims, which means that Defendant Wilhoit does not.

The Court will now turn to whether Defendants have established that there are no genuine issues of material fact on the state law claims. According to the Complaint, the assault and battery claims are based on the following allegations: Defendant Wilhoit drawing his service weapon; Defendant Wilhoit grabbing Keaton Yost's and Kameron Yost's arms, dragging them from the vehicle, slamming them into the vehicles, and intentionally placing handcuffs in a manner to cause

31

pain and injury; and Defendant Wilhoit tossing Keaton Yost to the ground and pushing him back to the ground. [Doc. 1 at ¶¶ 160-62]. The facts in the record show these allegations are entirely false. Accordingly, the Court finds summary judgment appropriate with respect to the assault and battery claims.

Further, as Defendants have explained in their Motion, in order to recover from an intentional infliction of emotional distress claim, a plaintiff must prove that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by a civilized society; and (3) caused her to suffer serious mental injury. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 210 (Tenn. 2012). Defendants state that there is no evidence in this case that Plaintiffs suffered a serious mental injury. The Court agrees.

Specifically, the Complaint states that Defendant Wilhoit intentionally inflicted emotional distress on Plaintiffs "by his outrageous conduct, including injurious words, the trauma of the abuse sustained by the children in public view, and the purposeful invocation of fear of physical harm and arrest—exacerbated by Wilhoit's loss of control of his emotions while armed." [Doc. 1 at ¶ 164]. The record, including the video, belies these allegations. Further, given the facts in this case, the Court does not find Defendant Wilhoit's actions meet the standard for outrageousness. *Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004) ("This standard for outrageous conduct is high, indeed."). Tennessee courts have followed the Restatement (Second) of Torts with respect to what constitutes outrageous conduct, which provides:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Cossairt v. Jarrett Builders, Inc.,* 292 F. Supp. 3d 779, 789 (M.D. Tenn. 2018) (quoting Restatement (Second) of Torts, Section 46, Comment D). Accordingly, the Court finds summary judgment warranted on Plaintiffs' intentional infliction of emotional distress claims.

With respect to the false imprisonment claims, the Court finds Plaintiffs' claims survive summary judgment.[13] Defendants argue that the false imprisonment claims must be dismissed because there was probable cause for the stop and seizure. In addition, Defendants state that as soon as Howard Yost admitted to driving, Keaton Yost and Kameron Yost were released.

In Tennessee, in order to establish a false imprisonment claim, "a plaintiff must prove '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'" *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)). Here, Plaintiffs' state

---

[13] The Court notes that the Complaint states, "Wayne Wilhoit intentionally and without justification falsely imprisoned [Howard], Keaton, and [Kameron], by effectuating a warrantless arrest not pursuant to a mittimus of the court and without cause." [Doc. 1 at ¶ 163]. One court explained, "A false arrest by a police officer is one means of committing a false imprisonment" and that "the claims of false arrest and false imprisonment are the same since the alleged false imprisonment arises out of the alleged false arrest by the defendant officers." *Lee v. Ritter*, No. 1:02-CV-282, 2005 WL 3369616, at *10 (E.D. Tenn. Dec. 12, 2005). As one court further explained, "[A] person who is falsely arrested is at the same time falsely imprisoned, and an unlawful arrest may give rise to a cause of action for either false arrest or imprisonment or both." *Murray v. Stockton*, No. 3:04CV501, 2007 WL 172521, at *8 n.14 (E.D. Tenn. Jan. 18, 2007), *clarified on denial of reconsideration*, No. 304-CV-501, 2007 WL 433289 (E.D. Tenn. Jan. 29, 2007) (citing 32 Am. Jur. 2d False Imprisonment § 3 (2006)). In the Complaint, Plaintiffs allege a claim for "false imprisonment," and therefore, the Court will refer to the alleged tort as "false imprisonment."

law claims are distinct from their federal claims. *Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020).

Specifically, in *Weser*, the Sixth Circuit reversed the district court's decision to grant summary judgment on plaintiff's false arrest claim. *Id.* at 517. The defendant in *Weser* arrested the plaintiff after he found probable cause that the plaintiff committed criminal trespassing. *Id.* at 514. The plaintiff filed a lawsuit alleging violations of the Fourth Amendment for unreasonable seizure, and she asserted a state law claim for false arrest. *Id.* at 512. The district court dismissed plaintiff's claims against the defendant, finding that the defendant had probable cause to arrest the plaintiff for criminal trespassing. *Id.* at 514.

The Sixth Circuit affirmed the district court's dismissal of the Fourth Amendment claims but found otherwise with respect to the plaintiff's state law claim. *Id.* at 515. The Court noted that in Tennessee, criminal trespass is a misdemeanor offense, and an officer can only arrest an individual if a misdemeanor is committed in the officer's presence. *Id.* at 518. The Court stated that Tennessee courts have not addressed whether an individual may pursue a state law false arrest claim if an individual is arrested on a non-arrestable offense. *Id*. Thus, the Court remanded the case to the district court with the instruction to enter an order declining to exercise supplemental jurisdiction over this novel state issue given that the federal claims had been properly dismissed. *Id.*

As mentioned above, the parties dispute whether Howard Yost committed felony evasion, but they do not dispute that he committed minor traffic violations. Thus, in reviewing the evidence in the light most favorable to Plaintiffs, and based on the above authority, the Court finds a genuine issue of material fact with respect to Plaintiffs' false imprisonment claims.

34

## IV. CONCLUSION

Accordingly, for the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment [**Doc. 81**]. Kameron Yost's unreasonable seizure claim and Plaintiffs' false imprisonment claims shall proceed to trial, and all other claims are hereby **DISMISSED**.

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge